## DICK et al. v. LEDERLE ANTITOXIN LABORATORIES.

District Court, S. D. New York.
May 16, 1930.

Wallace R. Lane, of Chicago, Ill., and Oscar W. Jeffery, of New York City, for plaintiffs.

Gifford, Scull & Burgess, of New York City (Livingston Gifford and Charles W. Mortimer, both of New York City, of counsel), for defendant.

CAFFEY, District Judge.

I have listened for five weeks to the presentation of this case. I have reached definite conclusions in my own mind.

I regret that time is not available for more reflection; also for the preparation of a careful statement of my views. I have explained to you, however, why, at least why according to my methods of work, it is necessary for me promptly to dispose of matters committed to me. In the condition of the calendars of this court it is essential to get rid of one case before going on to an-other, certainly in all instances except where the circumstances are quite exceptional.

Moreover, I think that litigants are entitled, as of right, to prompt decisions. I think also that I am more apt, particularly in dealing with the facts, to render a just decision when all the evidence is freshly in mind and when I still retain clear impressions of the proper weight to be given to the testimony of the various witnesses, due to exhibitions of bias in manner of testifying or to any of the other characteristics in the giving of testimony with which lawyers are familiar.

As I have also said to you, it does not seem to me that a judge can rightly be charged with the duty of deciding a case right. All that he owes, as I feel, is to give a full and fair hearing and then to exercise his best judgment. He is not responsible for the creation or for the continuance of the conditions under which he is compelled to work. He must be practical and perform his functions as best he can under those conditions.

It is for the reasons stated that I am going to dispose of this case right now.

With minor exceptions, I shall confine myself to what I conceive to be the issues of the case and what it is required that I pass on in order to determine those issues. At a later stage I shall make some remarks, not perhaps strictly within those issues, but which, according to my feeling, are appropriate to a proper discharge of my judicial duties. There is a special reason why, save as indicated, I shall refrain from going further than is required in order to dispose of the issues. This I will point out hereafter.

I shall perhaps engage in some repetition. I do that in an effort to make plain what I am endeavoring to say. I shall deal almost exclusively with the facts. I do not think that it would be of value, at least not of value according to my purpose, for me, in this connection, to engage in any discussion, and certainly not in any extensive discussion, of the law.

My purpose is to make clear to counsel, and in the event of an appeal clear to the Circuit Court of Appeals, the grounds that have led me to take the action which I shall take in this case.

As I see it, there are here six questions:

(1) Are the matters on which the plaintiffs rely patentable?

(2) Has it been shown that there was invention?

(3) Are the processes relied on useful?

(4) Were they anticipated either by the Dochez patent or by publications?

(5) Was the patent impaired or invalidated by occurrences in the Patent Office?

(6) Has infringement been established?

From the statement by defendant's counsel at the opening, I gathered an impression, which I gained also from the answer, that it was the contention of the defendant that there was nothing in the patent which was properly the subject of a patent.

In that apparently I was in error. I understand now, from the brief of defendant and from the oral argument, that substantially the contention of the defendant on this branch of the case is that the matter covered by the seventh claim is not the subject of a patent. As I construe the patent in suit, as worded and as elucidated by what I have listened to, and considering the claims as they must be considered in connection with the specifications, there is no ground whatever upon which it can be maintained that any of the matters described in the claims outside of the seventh is not a process. Each such process is, within the meaning of the patent laws, an art.

When we turn to the seventh claim, referred to by defendant's counsel as the skin test, it seems to me also that there as well the patent describes merely a method or a means by which a practical result can be obtained. It is an operable means or method, as demonstrated by its extensive use. It follows, as I understand the discussion of the eighth claim in the Morse Case, and as I understand the Morton Case, that such means or method is the proper subject of a patent.

I have previously said that I shall not engage in any extended discussion of the law. It would be useless at this stage. It is not needed in order to dispose of the case. I have merely indicated the ground on which I reached the conclusion that in every respect, so far as concerns the claims relied on by the plaintiffs in the trial of this case, they embrace only processes or methods or means, each of which is the proper subject of a patent.

Was there invention?

As I view this case, it can be disposed of without going into a branch of the testimony to which a great deal of time has been given.

As I conceive it, even if long prior to the work of the Dicks, or the work of Dr. Dochez, it had been settled and determined and accepted by the world that an identified germ was the cause of scarlet fever and there were no dispute about that, the patent involves invention. It rests on the extraction of a soluble toxin. In and of itself such extraction constituted, in my view, an addition to the world's knowledge, a benefit to humanity, and an advance over what theretofore had been known.

That, as I conceive it, discussing this branch of the case now within the narrow limits to which for the moment I have assigned it, is the key to this invention. The rest follows as a consequence or as a detail.

The scope of the patent, as I understand it, is nowhere better stated than in Exhibit 31 by the plaintiffs themselves, where in their article of July 12, 1924, they stated what they deemed to be the discovery. They there said: "The discovery of this toxin offered a scientific basis for: (1) the development of a skin test for susceptibility to scarlet fever; (2) preventive immunization, and (3) the production of an antitoxin." That I believe to be the truth.

The evidence of the newness of what was accomplished, and of what would follow from the separation off of, and the finding of a method by which there could be separated off, this toxin comes from all sorts of sources and in all sorts of ways.

There was quick acclaim from the public. It came from laymen. It came from scientific men. It came from physicians. It came from institutions. It came from the government.

I shall make some comment later on Dr. Dochez. I agree with plaintiffs' counsel that nothing could truthfully or properly be said about Dr. Dochez except in his praise. I turn now, however, to evidence that comes from him on this branch of the case, as to whether what I have referred to as, in and of itself, constituting an invention was an invention.

Twice in the patent granted to Dr. Dochez he gives testimony in favor, as I conceive it, of what had been done by the plaintiffs in extracting a soluble toxin constituting invention.

On page 1 of the Dochez patent, beginning in line 31, he says "that streptococcus hemolyticus does not yield a soluble toxin when grown outside of the animal body."

He said that under the date of April 14, 1924, when he filed application for his patent.

Then again on page 2 of the Dochez patent, beginning on line 110, he said: "The

method" (that is, the process by which the agar plaque is employed; by which the resultant antitoxin is produced in his process) "hereinabove described is believed to be generally applicable in essentially similar cases, where a soluble toxin cannot be directly prepared either by growing the bacteria in a nutrient medium outside of the body or within the body with free access to the body fluids."

Dr. Dochez also gave testimony to the same effect in his article of February 16, 1924, Exhibit X–1, Exhibit 117–A, where he said, in substance, that no soluble toxin in vitro could be produced. He said that there had been numerous attempts "to produce a soluble toxin in vitro. So far, no toxin of any considerable potency has developed." Again he said, in the conclusions of the article, that "but slight evidence of the production of a toxin in vitro has been obtained up to the present time." Then again in his Harvey lecture of January 17, 1925, Exhibit C–2, on the "Etiology of Scarlet Fever."

Referring to their article of October 6, 1923, he credited the Dicks with having produced experimental scarlet fever, and in their January 26, 1924, article with having confirmed the result. He speaks of their having "proven" susceptibility by employing the skin test, which they "devised."

The defendant, however, by its conduct, gave most convincing evidence that this extraction or separation out of the soluble toxin was an invention. It had not produced by any such method before. It had not previously undertaken to produce scarlet fever toxins or antitoxins, as I understand the proof, and yet, upon the appearance of the descriptions of the methods and processes of the Dicks in their 1923–24 articles, the defendant immediately shifted to the use of those methods and processes.

Not alone was there general and widespread acclaim of the novelty of the methods that had been announced by the Dicks. Not alone did the defendant take them up, but numerous licensed manufacturers have accepted and practiced them ever since.

So that, considering this case upon the branch of what is the essence of the patent, it is demonstrated to my satisfaction, and I think the proof is beyond reasonable doubt, that the methods described in the patent, also previously described in the 1923–24 publications of the Dicks with such precision that they were practiced before the patent could get under way, constituted invention.

Now, according to my reading of the decisions, although the word "inventors" and the word "discoveries" appear in the Constitution itself (article 1, § 8, cl. 8), and although the descriptive words in section 4886 of the Revised Statutes (35 USCA § 31) of what is patentable have come down to us for about 140 years in their present form, there is still room for debate, at least when we employ the English language to express our thoughts, as to what is a proper definition of "invention" and what is a proper definition of "discovery" and what is the precise line between the two.

It seems to me that while, as everybody of course concedes, no patent can be granted for a discovery, no patent can be granted for finding out what is a law of nature, yet when you take into account the facts of this case and what was the subject-matter dealt with and are attempting to draw the line as to when the processes with which we are concerned passed beyond the point of being merely a conception or passed beyond the point of being merely in the experimental stage and became entitled to be called an invention as distinguished from a discovery, particularly when we seek to fix the date when they reached the stage of invention, it is pertinent to examine the proof with a view to determining when the discovery was made.

As I have said, the key to the processes of the patent in suit is the extraction of the toxin in solution; but by no possibility could there be a determination of when plaintiffs had in hand the proper and appropriate toxin to deal with until it had been determined what was the cause of scarlet fever.

Having determined what the cause was, then, by the application of what was already known in the art, the processes could be devised.

Or, to put it in different way, when the experimental form of the processes had been employed to the point when it had been proved what was the cause of the disease, thereupon they became an invention.

Or, to put it in still another way, whatever the processes that might be employed, until it had been determined and proved what was the cause of scarlet fever, none of such processes had been carried out to the point where it was invention.

The proof, therefore, of the date of discovery of the cause of scarlet fever is in effect, as it seems to me, substantially the same as, under the facts of this case with respect to the employment of a great variety of de-

vices, the determination itself of the date of the invention.

It is within that field, wholly separate from the narrow ground upon which I have considered the subject of invention up to this time, that I turn now to the evidence as to who discovered the cause of scarlet fever and what was the date.

In this connection it is interesting to note, first, what defendant published on the subject.

Exhibit 74 is a pamphlet issued by the defendant. The precise date of issuance has not been shown in the evidence, but it is marked from 1915 to 1925. It deals with scarlet fever. Under the heading of "Cause" there appears this:

"The microorganism that causes scarlet fever has not been proven. Numerous investigators have attempted to discover a specific cause, but none of the bacteria has stood the test of study by later students of the subject. It is quiite generally agreed that the cause of most of the secondary complications of scarlet fever is a streptococcus. Most investigators who have studied this problem have concluded that streptococci are only secondary factors and while responsible for most of the mortality in scarlet fever, are entirely distinct from the real cause of the disease.

"Streptococci are constantly found in the throat of scarlet fever patients and can be isolated from the blood of scarlet fever patients during life and almost constantly after death, and in the majority of cases of scarlet fever, the cause of the complications and death is the streptococcus. It is probable, however, that the streptococcus plays a secondary role in scarlet fever, as it does in smallpox. The disease itself may be due to a protozoan-like body described by Mallory, which lowers the resistance of the body to streptococcic invasion. It is generally accepted that the streptococcus is always associated with scarlet fever, both in the throat and in the septic complications."

The statement just quoted from the defendant is a pretty fair account of how the matter stood at the inception of work by the Dicks in 1912. Before examining the evidence of what they did, however, it would seem advisable to have some definition of discovery, particularly in the field of bacteriology. I have found Koch most helpful.

I realize that Koch's postulates are not a part of the law; but, as I understand the evidence in this case, with the progress of the science of bacteriology we have in Koch's laws

a basis, an index, by which to determine when discovery has been arrived at, and, until Koch's laws are satisfied, in the state of scientific learning to-day, we have not yet reached the point in bacteriology when we can appropriately say there has been a discovery.

I do not rest alone, however, upon what I have heard from the witnesses about the applicability of Koch's laws as a measure of when discovery in bacteriology has been reached, because I think that, as a part of the law of common sense, what Koch says must be complied with, must be tested out, and must be tested out in a variety of ways, before it can be said that such proof has been made of the determination of what is a bacterium—what is the bacterium that causes a particular disease—that in a proper sense it has been discovered.

These laws, as I understand them, are four:

(1) The suspected organism must be found constantly in the proper tissues of an animal suffering from or which has died from the disease.

(2) The organism must be cultivated artificially in a pure state.

(3) The disease must be reproduced in a suitable animal by inoculation with the pure culture.

(4) The organism must be cultivated again from the tissues of the experiment animal.

I shall not review the proof having to do with the second, third, and fourth laws. I do not know how far back it would be possible to trace in the evidence the hemolytic streptococcus having to do with scarlet fever that would partially satisfy the requirements of Koch's laws. Certainly it goes back a long time. But the final test, and the one that remained to be solved, was under the first law, whether or not there had been picked out the particular germ that constantly appeared in all cases of the disease; which of the approximately fifty known forms of hemolytic streptococci was shown to be always present in the disease.

To determine that, there was a very large number of experimentations on animals and on humans before anybody could say that it was proved.

Now, what is the evidence on the point?

The defendant says, as I understand it—if it is not said expressly, at least it is implied—that the point had been reached by Dr. Dochez as early as January 16, 1924, or

perhaps on January 10, 1924, when he delivered to the nurses at the Presbyterian Hospital the same address that he delivered six days later before the Society for Experimental Biology and Medicine.

Dr. Dochez there was talking about the significance of streptococcus hemolyticus in scarlet fever and reporting the results of certain studies.

He gave a résumé of the evidence on both sides. It is very important, in order properly to interpret this address, to bear in mind what Dr. Dochez had to say about Jockmann. He recites, as a part of the evidence, the tipping of the scales by Jockmann's investigation against the etiological importance of the streptococcus hemolyticus. He says that Jockmann claimed that "it is unreasonable to suppose that a specific disease such as scarlet fever can be caused by an organism giving rise to such varied manifestations as streptococcus hemolyticus and furthermore that the presence of this organism cannot be demonstrated in certain rapidly fatal malignant instances of the diseases."

Then Dr. Dochez goes on to summarize certain evidence on the other side, certain work done by him or under his direction, including the generation of experimental scarlet fever in guinea pigs; also the report of the Dick work in October, 1923, with human inoculations. After reciting all of that, this is as far as he goes: "Such a sequence of observations undoubtedly again throws the balance of evidence in favor of streptococcus hemolyticus as the causative agent of scarlet fever. It would seem that the disease may not be unlike diphtheria in that the principal localization of the infection is in the throat where the organism produces a toxin which gives rise to the general symptoms and the rash. The immunity produced is in all likelihood antitoxic in character and the blanching reaction represents the neutralization of the toxin in situ."

That was merely a report of progress. It is not the announcement of having determined the cause of scarlet fever. It is a very careful, frank, and judicious review of the evidence. It is wholly inconclusive. So far from announcing a discovery, on the contrary, discovery is disclaimed.

I may add that in the New York Times article of the next day, January 17, 1924, following a quotation from the address itself, but stated in form as coming from Dr. Dochez, there was this sentence: "No ground yet for stating that a serum has been discovered which has a definite curative agent."

On the other hand, what is the evidence as to date shown by the publications of the Dicks?

There are two significant articles by the Dicks in the American Medical Association Journal. In one, on October 6, 1923, Exhibit 28, they reported that they had produced a case of experimental scarlet fever through employing a culture from a strain which fermented mannite. In the other, on January 26, 1924, Exhibit 29, they reported that they had produced experimental scarlet fever with a culture from a strain which did not ferment mannite. Thereupon they announced, in the article of January 26, 1924, that now, having used both types of the strain, that which fermented and that which did not ferment mannite, they had satisfied the first of Koch's laws; they had proved that this organism, which they had identified, was constantly present in cases of the disease; and they therefore announced the conclusion that the hemolytic streptococcus described caused the disease.

Now I repeat that the function of date of the discovery, so far as concerns its probative force or its employment here in determining the issues of this case, is the bearing of that date upon when the experimentation, or when the conception of the processes with which these two sets of workers were engaged, reached the point of invention.

It does not require public announcement or announcement through professional magazines in order to determine the date of invention; but, in my review of all the evidence, the most satisfactory kind of evidence, about which there is the least possibility of mistake, is such public announcements as those I have discussed.

I conclude, therefore, that the processes described in the patent in suit constituted invention.

I conclude this, whether the problem be considered within the narrower limits which I first discussed relating to the extraction out into solution of the toxin or whether we consider it upon the—or what seem to me the—broader lines having the probative effect I have assigned to them as to the date when there was determination as to what was the cause of scarlet fever.

There are numerous other dates disclosed by the evidence relating to the work of Drs. Dick and Dr. Dochez. They are easily stated. All have to do, however, only with what preceded discovery; when, at best, what is involved in the two patents was still in the

634

stage either of mere conception or of investigation or of experimentation; when plainly and undisputably there had not been either discovery or invention by the Dicks or by Dr. Dochez. I deem it unimportant therefore to mention them.

Next, was the Dick invention useful?

 The evidence is without dispute on that point. Its utility is established by the defendant. Its utility is shown by the medical testimony, including that of Dr. Weaver, Dr. McCormack, Dr. Fishbein, Dr. Park, Dr. Zingher, Dr. Dochez; by the bacteriologists, including Mr. Young; by the manufacturers; by a vast collection of documentary evidence; by extensive commercial distribution; by the public health authorities.

There is no occasion to go more into detail on that branch of the case.

Was there anticipation?

 Was it anticipated by the Dochez patent? If I am right in my conception that the extraction or the method for the extraction of soluble toxin, in and of itself, is the key to the Dicks patent, then it follows, as a matter of course, that the Dochez patent did not occupy the same field; there was no anticipation. If the Dochez patent had been granted ten years ahead of that time, there would still not have been the slightest interference or duplication.

It is perfectly manifest that the Dochez patent occupies a much narrower field in its specifications, in its claims, and in its practical uses. I do not think there can be any pretense that the Dochez patent covers any process that would have, to be within, the scope of the Dick patent either for testing for susceptibility or for immunization. The Dochez patent, as I understand it, and as I believe the proof establishes, is confined to the curative effect of its process. It comes into only one branch of the same field as that occupied by the Dick patent.

Now, when it gets into that field, of a method for the production of antitoxin, while I cannot adjudicate anything here—I would not try now to adjudicate anything—that would be binding on Dr. Dochez, it seems to me that his method of producing antitoxin, by the employment of the agar plaque, is such a wholly different method from that employed under the plaintiffs' patent, of using the extracted toxin in solution, that the Dochez patent cannot be said to involve invention of the same kind.

There is more that I could say about the Dochez patent; but I dispose of it, so far as affects the case at bar, on that broad ground.

With respect to publications, we are concerned only with those in foreign languages. The articles in English mentioned in the answer clearly contain nothing of moment except what was derived from European journals.

Here again, if what I have said be correct as to what constitutes the essence or key to the process involved in the patent in suit, namely, the extraction of the toxin in solution, I do not see how we can interpret anything revealed in the foreign publications as having arrived at the point where it anticipated the employment of that process; much less can it be said that any of the descriptions in those articles, which I have examined over and over again during the course of this trial, embraces a process, which is operable by one skilled in the art, constitutes, or is stated with that degree of clarity required by the law in describing a process sufficient to constitute, an anticipation.

I am not going into all of the different processes discussed in the foreign magazines. I have selected two which seem to me to be more specific in statement than any of the others. I shall use those as illustrations.

Those two are by Moser and by Gabrichewsky. I will comment on Savchenko later.

As I said, the processes of earlier date most nearly definitely described in the literature are those of Moser and Gabrichewsky; after all, be it remembered, it is not the scholarship or the learning that concerns us, it is processes that we are dealing with, and it is the processes that must be clearly described in the literature.

The Moser process is described in articles 1 and 2 of Exhibit F. It is also referred to, as you will recall, in the defendant's pamphlet, Exhibit 74.

In article 1, published in 1902 and translated from the German, the Moser serum is thus described:

"Immunize animals with streptococci gained from the cardiac blood of persons who had died of scarlet fever. * * *

"The horses were treated with injections of gradually increased doses of a mixture consisting of living streptococci cultures which had not passed through animal bodies and were only grown from one bouillon to the other. After a treatment carried on for several months, the blood of these horses was tapped and the serum, without the addition of carbolic acid, was injected into scarlatina patients."

In article 2 the description of Moser's method was this:

"The horses receive injections of bouillon culture of streptococci direct from the child."

Dr. Shaw further says in this article, published in 1904:

"The steps in the production of this serum briefly, are as follows: An ordinary bouillon culture is made from the heart blood of a fatal case of scarlet fever, and grown for three to six days. It is then injected subcutaneously into the horse. This produces a slight reaction with fever, etc. These injections of cultures from different cases are given over a week in gradually increasing doses. It takes seven to nine months to produce a suitable serum, and some horses are never able to produce a satisfactory serum. No carbolic acid is used to preserve this serum. When sufficiently potent, the serum, in a dilution of 1 to 250,000, should agglutinate the streptococci."

It does not seem to require any argument to establish that this was not the announcement in definite form of an anticipation of the process whereby soluble toxin was abstracted and then employed in the various ways covered by the patent in suit.

I have noted six separate descriptions in the documents of the Gabrichewsky process. The German article, No. 5 of Exhibit F, discussing the process, published in 1907, is specifically referred to in defendant's 1915–1925 pamphlet, Exhibit 74.

What a pity that Gabrichewsky did not survive! Apparently he devoted to scarlet fever work less than three years. He was a great scientist. Perhaps if he had survived, and had been supplied with adequate facilities, he himself would eventually have solved the problem.

But about his process, in article 4 of Exhibit F, translated from the Russian of 1906, it is said:

"The scarlatina vaccine is a concentrated bouillon culture of streptococci, derived from scarlet fever cases, killed by heating at 60° C. and then mixed with a five-tenths per cent phenol. Each cubic centimeter contains .02 to .03 cubic centimeters sediment of a bacterial mass, gained by centrifugalization; and .02 cubic centimeters of this sediment corresponds to .005 grams of the dry substance."

In the sixth article in Exhibit F also there is translated from the Russian of 1906 this description:

"A condensed bouillon culture of streptococci obtained from the sick with scarlatina, and killed by heating to 60° centigrade, and

then followed by the addition of .5 per cent carbolic acid. Each cubic centimeter contained .02 to .03 cubic centimeters of bacterial mass sediment obtained by strong centrifuge. .02 cubic centimeters of such a centrifugate corresponds with .005 grams of a dry residue."

At the memorial meeting to Gabrichewsky in 1908, reported in article 8 of Exhibit F, also translated from the Russian, it was said of his vaccine:

"He prepared a bouillon culture of streptococci obtained from the blood of hearts of children who had died from scarlatina, and which were not passed through the system of laboratory animals. This culture killed by heating it to 60 degrees and the addition of .5 per cent of phenol and then condensed, served as a vaccine."

In addition, the Gabrichewsky serum is described by Smith in his article, No. 11 of Exhibit F, published in 1910, and by Palmirski in his article, No. 18 of Exhibit F, from the Polish, published in 1909.

As I said of Moser, so I may say of Gabrichewsky, it seems obvious on the face, from a mere reading of the articles, that the publications in evidence contain no such definite or clear description of a process as could, by the remotest use of the imagination, be said to include or be descriptive of the process of extracting toxin and employing it in the way called for by the process of the patent in suit.

Gentlemen, as it seems to me, according all the credit and all the praise we can truthfully give to these foreigners, who apparently were engaged only about five or six years on the problem, we must say as a fact that they were merely groping. Their own comment so declares. Their work does not constitute anticipation, in the sense in which anticipation is used in the law of patents in this country.

As to Savchenko—a learned man, a scientific man; all credit to him—I am not going into all the details of his method, because the description is very long. It was not an anticipation. Let us read the words in which he himself says so.

After telling about his serum, to the extent that we have a description of it before us, and after relating his experiences, he said in his article, No. 3 of Exhibit F, published in 1905:

"I have brought out the above data not for the sake of proving that a reliable method has been worked out for obtaining antiscarlatina serum. On the contrary I am bringing

out these facts to show that regardless of our imperfect method, regardless of our groping in the darkness, a satisfactory serum is obtainable.

"It is to be hoped therefore that with the experiments on a broader scale which is possible for institutes equipped with larger numbers of horses, that having obtained a possibly strong toxin, having learned how to preserve the original virulence of streptocqcci and having improved the very process of immunization, other workers will be successful in procuring a stronger serum and in furnishing us with as powerful means against scarlatina as we have at present against diphtheria."

It is also a very significant fact about Savchenko that in 1913 the learned doctor who came here from Chicago, the head of the John McCormick Institute, Dr. Weaver, had the 1905 Savchenko article in translation, and, as the defendant said in oral argument, in substantially the same form in which it was translated by Mrs. Kolchin, defendant's witness. Yet that great learned man put that article, along with all the other literature he had collected bearing on this problem, into the hands of the plaintiffs in 1913 and set them to work to find out the cause of and a cure for scarlet fever. He testified plainly and distinctly that up to then the medical profession had accomplished little; that they knew little; that they had no process whatsoever for application.

In the light of the estimate of a witness of that intelligence and of that character, can it be said that Savchenko had anticipated the process of plaintiffs? If the problem had already been solved, would Dr. Weaver have had plaintiffs spend eleven years longer on it, under his immediate direction?

You can make all the analysis of words from our imperfect English language you care to; you can build together, after the event, forensic material having all the plausibility in the world, and yet it does not disprove a fact, the important fact; the fact that stands out here, namely, that Dr. Weaver, skilled in the art, could not read into the Savchenko article, then in his hands, any process whatsoever for handling this problem, much less this process which he appeared on the witness stand to sustain, that is covered by the patent in suit.

All we are warranted in saying about these foreign articles is that the great doctors in Austria and in Poland and in Russia whose work they describe, these leaders in medical science and bacteriology in those countries, were groping towards a solution, but that they never approached within a thousand miles of it, and that it remained for these Americans, who have appeared at this trial, finally to solve a problem which has persisted from 1675, when Sydenham first segregated off and gave a name to scarlet fever as different from measles.

Approximately 240 years were devoted to solving the problem. So far as brought out in evidence, less than six years covered the work of Moser and of the Polish scientists and of the Russian scientists. With all their great learning and with all their great skill, they were wholly and absolutely unable to separate out and prove and establish the identified type of streptococcus hemolyticus which is the cause of scarlet fever. The finding and the identification of that stand necessarily at the very base of devising anything that can constitute the invention. Without the determination of the precedent fact of what is the cause of the disease, without the discovery of something which is unpatentable, there could not follow the invention of a process which is patentable.

Next, was the Dick patent impaired or invalidated by the procedure in the Patent Office?

I think I have already answered that question. If the Dochez application had been standing or the Dochez patent had been issued long before the Dick application was filed, it would not have constituted an interference. The Dochez patent is not assailed by the plaintiffs. It is different.

How can there be any intervening rights? Certainly, so far as the defendant is concerned, the procedural assault is predicated solely on the Dochez patent.

There was no laches on the part of plaintiffs in prosecuting their application; and there are no facts here which possibly could constitute an estoppel in favor of defendant. The defendant took the Dick processes and used them. It was able to use them, as Mr. Beard said, through information derived from the 1923–24 Dick publications. How can defendant claim that any withholding in the original application or any alteration in the amended application created an estoppel?

We can go further. The English language is not capable of being used with great exactitude or in making a very precise definition or description. That fact must be taken into account in the interpretation of any document. Of course, the amended specifications were much more elaborate than the

original specifications. Yet I fail to find any essential feature of the patent as granted that was not embodied in the original specifications.

Certainly, there is nothing to sustain a charge that there was a conscious withholding by the applicants of any proper information that they should have disclosed. If I am right in what I have already said, such a charge would be an absurdity; because, as previously pointed out, the 1923–24 articles of the Dicks, appearing in the American Medical Association Journal before the original application was filed, furnished adequate information on which to operate and to manufacture the products by the processes for which a patent has now been granted. That is manifest from an analysis of the language of the articles. It is manifest also from the conduct of defendant.

Was there infringement?

That there was is undisputed. It is established by the defendant's own evidence. It is established by its documents, by its advertisements, by its labels, by its application to the American Medical Association Committee, and by its application to the government.

Mr. Beard and Mr. Voigt are highly reputable and were frank. I do not criticize or mistrust them in the slightest. Nevertheless, I am not satisfied that they have dug to the bottom of all the records of their plant. I am not sure on the evidence that until that has been done I could do full justice with respect to the extent of the infringement. I am inclined to think that there has never been an operation by defendant exclusively under the Dochez patent. In so far as in an operation defendant has confined itself to the Dochez patent, there was no infringement. But I am not sure that this has ever occurred. There must necessarily be a master in this case to take an accounting. He should afford defendant opportunity to go more into details with respect to whether it has made a thorough search for all its records and has ascertained instances in which in the production of the product it has confined itself to the Dochez patent. Outside of those instances, defendant's toxins and antitoxins have infringed. By classification in his report, the master can designate separate items of damages, so as to afford an easy method of review.

The question has been raised as to whether the plaintiffs are entitled to aggravated damages. I am not going to determine that at this time. I prefer to have the master first consider the question and make a recommendation. That seems to me fairer to the defendant. It is pretty clear that, in employing the process covered by the patent in suit, the defendant did so by design and intention. Nevertheless, the extent to which, under the statute, the court ought to go, if at all, in awarding aggravated damages, can better be determined after the coming in of the master's report.

Now as to the claims:

A decree sustaining the fifth, eighth, and ninth claims alone would entitle the plaintiffs to an injunction and an accounting.

So far as concerns other claims relied on by the plaintiffs, the first, third, and sixth, if subject to criticism at all as descriptions of processes, I think at the worst have only the fault of being repetitious. I sustain those three claims also.

I think the seventh claim is likewise good, and I sustain it. But I separate if off from the other claims for this reason: I will not determine at present whether the plaintiffs are entitled to an injunction as against the use of the process covered by the seventh claim. My feeling now is that, in so far as the defendant restricts itself to using Dick test material furnished by the government, and uses it in conformity with government requirements, solely for the purpose of standardizing antitoxin manufactured exclusively in compliance with the Dochez patent, no injunction should be included in the decree. I will either determine that question on the settlement of the decree or postpone it until the coming in of the master's report. I am not decided yet which is the right thing to do.

I may say with respect to the seventh claim that I do not regard the Schick test as an anticipation. Plaintiffs were entitled to use the accumulated knowledge of the world just as much as the defendant or as much as other people who have no patents.

When plaintiffs devised something new which is definitely and specifically applicable to the problem of scarlet fever and which is a process, the efficacy of which cannot be determined without wholly independent invention and which could not be invented without the discovery that I have described, it cannot be properly said that it was anticipated by a wholly inapplicable process in another field, relating to a different subject-matter.

Why is it that people did not go around for years, previous to the Dick test, deter-

mining susceptibility to scarlet fever by the Schick test? The testimony is overwhelming and convincing that, until we got the Dick test, the world had no way at all to determine susceptibility to scarlet fever with precise certainty and definiteness, so graphically described by Dr. McCormack in his testimony.

Humanity waited all these years for this test, which now has the approval and extensive use of the United States government itself. When you ask me to say that the Schick test anticipated, I think you ask me to ignore the actualities that speak louder than any kind of words can do.

Now, gentlemen, in the beginning to-day I said that I would confine myself as nearly as I could to what I conceived to be the essential issues of the case; that, though I did not want to go beyond those issues, I did consider that it was within the province of the court, after having sat here for five weeks and heard all these facts, to indulge in some comment.

I want to say that there is nothing but praise for the Drs. Dick and for Dr. Dochez. Not only would I make no finding in this case that would affect the feelings of either if I could avoid it, or attempt to apportion credit, but, in view of a suggestion I am going to make, I trust that there may be a joining of hands between them. There is credit enough for everybody.

The court, in a way that is rare, has engaged in the consideration of a subject that affects primarily the public welfare; not alone the public welfare, but the actual operations of a branch of the government. The court is but another branch of the government. Under the circumstances, I think I am warranted in making the remarks I am now about to make.

I want to say, first, with respect to the Drs. Dick and Dr. Dochez, that all of them are demonstrated to have been animated by the highest motives; also that nothing has been done by them that offended in the slightest the ethics of their profession.

Their conduct in passing these patents out of their own hands and into control, one of the Presbyterian Hospital and the other of the Scarlet Fever Committee, so as to dedicate them to the benefit of the country, is the utmost manifestation they could make of their desire to serve mankind and to live up to the ideals of their profession.

There should be no rivalry between the Presbyterian Hospital and the Scarlet Fever Committee. Their purposes are the same. I therefore ask counsel to convey to the hospital and to the committee the request of this court that they interchange views, in order to see if there may not be, in the interest of the public health, in the interest of safeguarding the children in this country, some kind of a joinder of effort in whatever form they may deem wise.

It would be unfortunate if there should arise a feeling of misunderstanding between the hospital and the committee. Nothing could be worse than rivalry between them. After hearing the evidence, I feel sure there is no occasion for rivalry. I know it must be true, I am confident it is true, that neither institution is animated by a motive of that kind. It ought to be possible, therefore, to work out a program for co-operation or possibly for a joint enterprise.

What we know about science, what we read in the books, what we read even in the law books, teaches us that the end of a great work like this relating to scarlet fever has not yet come. A great thing has already been done; but further things will be done.

The patent on the telephone was granted a long time ago; yet for more than fifty years the telephone has been invented and invented almost every day. It is being invented right now.

With all credit to the doctors who have obtained these patents, if we are to base our anticipations upon the teachings of experience, still much more will be accomplished for the public health. All the weightier the reason therefore why there should be joint action by the hospital and the committee.

Gentlemen, it has been a matter of great interest and a very great pleasure to try this case. I want again to tell you how sorry I am that I could not take the case off and mull over it a long time before disposing of it. I regret that the practical situation prevented me from doing so.

I have had so much enjoyment out of the trial, I have such admiration for the way counsel have conducted themselves, that I wish I could please all by deciding in favor of both; but that is impossible.

The case has been tried with great vigor and ability. Yet everything has been done in accordance with the high traditions of the bar. The trial has been conducted in a way that helped the court to reach what it conceived to be the decision it ought to reach; and I am very thankful to you.

I think the facts as recited in the Dick articles of 1923 and 1924, as well as the de-

scriptions included in the specifications of the Dick patent, are established by the proof. Feeling that way upon the evidence, it can only result that there shall be a decree for the plaintiffs.

Let it be decreed that the patent is valid and infringed; also that claims 1, 3, 5, 6, 7, 8, and 9 are sustained. There should be an injunction and an accounting. A master will be appointed to conduct the accounting. The decree should contain provisions carrying out the purposes I have expressed, with the reservations I expressed in discussing the extent of the infringement and particularly with respect to the seventh claim.

Gentlemen, if you want me to sign the decree you will have to present it before July or after August. It should be settled on notice. How much notice do you want? Five days or ten days?

Mr. Lane: Why not five days' notice?

The Court: Is that satisfactory?

Mr. Gifford: I think that is all right.

The Court: Settle decree on five days' notice.

### Supplemental Opinion.

I am unable to see the applicability of either class of authorities relied on by the defendant. The distinction between the cases cited and the present case turns on the facts.

The government does not impose on the defendant the duty to employ Dick toxin as a condition to enjoyment of its right to manufacture under the Dochez patent or as a condition to interstate handling of what is produced under that patent. In the administration of a statute wholly separate from the patent laws, the government merely, in substance, denies to defendant the privilege of interstate sale or other interstate disposition under the name of antitoxin of products covered by the Dochez patent unless they have been previously tested by Dick toxin.

So also the use of Dick toxin in the process of manufacture by defendant is not the less an infringement of the patent in suit because defendant obtained the toxin from another, instead of itself producing it by resort to every step specified in the patent; and, on this point, it is wholly immaterial whether the toxin be obtained from the government or from a private individual.

If it were established that, unless Dick test material furnished by the Hygienic Laboratory be employed, a regulation pursuant to the Virus Act (42 USCA §§ 141–148) closes the channels of interstate commerce to products manufactured exclusively in conformity with the Dochez patent, I should doubt the propriety, certainly at this stage and without opportunity to the government for a hearing on the question of the regulation's validity, of awarding an injunction against the defendant using that material solely for the purpose of enabling it to avail itself of those channels. The evidence submitted, however, does not show to my satisfaction that there is any such regulation.

The regulations of February 3, 1927 (Exhibit 94), deal only with toxin. They are irrelevant here. The Dochez patent relates only to antitoxic sera.

The regulations of April 9, 1927 (Exhibits 94, 95), deal with what is there called "anti-toxin." Compliance with them apparently contemplates use of Dick toxin as a control. Nevertheless, as I construe them, they are confined to labeling. They do not restrict manufacture or transportation or sale, save in the respect that they affect labeling. Any article coming within the terms of the Dochez patent is free to move anywhere, under the name given to it in the patent, without regard to whether it has been subjected to a test involving Dick toxin.

Moreover, it was stated at the hearing, and, as I understand, it is not denied, that regulations under the Virus Act not in evidence expressly, without the use of Dick toxin, permit interstate commerce in articles prepared in accordance with the Dochez patent. If this be true, then it follows that the government does not require employment of Dick toxin by the defendant as a condition to interstate marketing of its products manufactured under the Dochez patent.

Otherwise put, I think that, within the issues of the instant case, there is no occasion to consider or pass upon the nomenclature which, pursuant to the Virus statute and regulations, the government compels a manufacturer to employ in order to avail itself of the channels of interstate trade for its products.

It may result from the Virus regulations of April 9, 1927, that without the use of Dick toxin as a test or control it would be unlawful for a manufacturer to send an article interstate under the name of "anti-toxin." As already indicated, however, that is merely a matter of labeling; and I feel that in this case, there is no concern with labeling. What is of consequence, in determining whether to grant an injunction, is whether the injunction would prevent or would contribute to preventing interstate movement of anything manufactured under the Dochez patent. As there has been failure of proof that there exists any governmental prohibition which would have such a result, unless Dick material be used, I have concluded that there is

no warrant for embodying in the decree the saving clause suggested by the defendant.

The full facts upon the matter in controversy between the parties on the settlement of the interlocutory decree should be before this court when it comes to consider the terms of a final decree, and before the Circuit Court of Appeals in event of an appeal, so that occasion for another reference may certainly be avoided. Accordingly, the master should find and in his report separately state the extent, if any, to which defendant has produced or used articles, by whatever name called, exclusively in conformity with the Dochez patent and the extent, if any, to which in such production or use the defendant has employed Dick toxin or other Dick patented product as a test or as a control or in standardization or otherwise.

In the event the Virus regulations not in evidence be different from what has been assumed above, then, upon the application which counsel have said will be made for suspension of the injunction pending appeal, those regulations may be brought to my attention.

Decree as submitted by plaintiffs, with the word "aggravated" eliminated from the fourth paragraph, has been signed.