**Application of Denise MANCY et al.**
**Patent Appeal No. 74–507.**

United States Court of Customs and Patent Appeals.
June 27, 1974.

Ellsworth H. Mosher, Arlington, Va., Charles A. Wendel, New York City (Stevens, Davis, Miller & Mosher, Arlington, Va.), attorneys of record, for appellants.

Joseph F. Nakamura, Washington, D. C., for the Commissioner of Patents; Fred E. McKelvey, Washington, D. C., of counsel.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Judges.

RICH, Judge.

■ This appeal is from the decision of the Patent Office Board of Appeals affirming the rejection of claims 1–5 of appellants' application serial No. 877,511, filed November 17, 1969, for a "Process for the Preparation of Daunorubicin." We reverse.

### The Invention

Appellants claim a process for producing the antibiotic daunorubicin by aerobically cultivating the microorganism *Streptomyces bifurcus, strain DS 23,219* (NRRL 3539). This strain is new to the art in that it is not shown by any of the references and was found in and isolated by appellants from a soil sample taken from the Val-de-Marne department in France. The NRRL designation identifies the classification location of a deposit of the microorganism at the United States Department of Agriculture in Peoria, Illinois, and there is no question that the application as filed meets the disclosure requirements of 35 U.S.C. § 112 as enunciated by this court in In re Argoudelis, 434 F.2d 1390, 58 CCPA 769 (1970).

Representative is claim 1:

1. Process for the production of Daunorubicin which comprises aerobically cultivating *Streptomyces bifurcus, strain DS 23,219* (NRRL 3539), of [sic, or] a daunorubicin-producing mutant thereof, using an aqueous nutrient medium containing assimilable sources of carbon, nitrogen and inorganic substances, and separating daunorubicin formed during the culture.

The four dependent claims specify certain further conditions of aerobic cultivation such as pH, temperature, and aeration rate, although apparently the conditions specified are conventional.

### The Prior Art

The references show the production of daunorubicin by similar aerobic cultivation of other strains of *Streptomyces*. The British patent[1] shows the use of *Streptomyces coeruleorubidus 8899* and *Streptomyces coeruleorubidus 31723* in an aqueous nutrient medium containing assimilable sources of carbon, nitrogen, and mineral salts, and the Chemical Abstracts[2] of articles by DiMarco et al. show that daunomycin (another name for daunorubicin) can be isolated from cultures of *Streptomyces peucetius*.

### The Rejection and Opinion of the Board

The examiner rejected all the claims for obviousness in view of the British

---

1. British Patent 985,598, published March 10, 1965.

2. DiMarco et al., Daunomycin, a new Antibiotic of the Rhodomycin Group, Chem.Ab,, Vol. 61 (1964), 12394c; DiMarco et al., Daunomycin, an Antibiotic for Tumor Treatment, Chem.Ab., Vol. 62 (1965), 16922a.

patent and each DiMarco reference on the ground that "It is not patentable to produce the known antibiotic from either a different strain of the same species [of microorganism] or a different species of the same genus [*Streptomyces*] unless something more is present than merely the utilization of another source from the same field of sources of these products."

The board agreed with the examiner and further cited two of its own prior decisions for the "established * * * general principle that the choice of a different strain of the same microorganism is *prima facie* obvious. Ex parte Arzberger et al., 155 USPQ 286 [1966]; Ex parte Kropp, 143 USPQ 148 [1959]." In the board's view, appellants had shown no unexpected results in the use of their strain of *Streptomyces* to rebut what it deemed to be the prima facie case of obviousness. Although the board admitted "that the search for the [sic, and?] testing of organisms for the production of an antibiotic is generally a long, tedious and expensive undertaking," it stated that this "does not in itself render patentable the production of the antibiotic with the organisms *thereby discovered* where no unexpected results are achieved." (Emphasis ours.)

### The Parties' Arguments

Appellants challenge the very basis for the rule applied by the board here and in the *Arzberger* and *Kropp* cases, alleging that the rule is based upon two false premises. First, appellants assert that the rule incorrectly assumes that it is obvious how to find a novel strain of microorganism because the physical steps involved in isolation of a strain are easy to describe, whereas there is really nothing obvious here because there was no guarantee that appellants would be able to isolate any novel strain of microorganism, particularly one capable of producing a useful product. Appellants allege that to deny, in these circumstances, that the isolation of the novel species forms a basis for a patent-able invention is to deny patentability "by the manner in which the invention was made," an approach prohibited by 35 U.S.C. § 103, last sentence. The second false assumption, which appellants allege is the foundation for the rule applied by the board, is that the novel strain, once produced, is likely, on culture, to produce a useful compound. Appellants assert that this is not the case, and that, in fact, most strains of microorganisms do not produce useful compounds on culture and thus, if unexpected results are required for patentability, the fact that a useful product is obtained where a novel strain is cultured is itself unexpected.

Finally, appellants allege that the proper test for determining the obviousness of a process invention, where the difference between the claimed invention and the prior art resides in the material used in the process, was enunciated by the court in In re Kuehl, 475 F.2d 658 (Cust. & Pat.App.1973), wherein we held that a hydrocarbon cracking process was not even *prima facie* obvious where the particular zeolite catalyst used in the process was not known to the prior art, the obvious parallel being that the particular strain of microorganism used here was not known to the prior art.

The solicitor responds to appellants' citation of and reliance on *Kuehl* only indirectly. Without mentioning *Kuehl*, he relies upon two earlier decisions of this court, In re Kanter, 399 F.2d 249, 55 CCPA 1395 (1968), and In re Neugebauer, 330 F.2d 353, 51 CCPA 1138 (1964). The solicitor states of *Kanter* (his footnote omitted and quotation corrected):

Kanter discovered that a silicon-containing "case" could be applied to a metal alpha-delta alloy base using one or more prior art processes. 399 F.2d 249, 55 CCPA at 1396. Kanter obtained an improved product—one in which the case would not readily separate from the metal base. Id. The Court held Kanter's process to be ob-

vious, observing (399 F.2d 249, 55 CCPA at 1397–1398):

> "We can only point out that the steps of the claimed process are old except for the alloy worked on and the new product. Appellant has achieved this new product by performing an old process on a starting material, or base metal alloy, not previously used in the process.
>
> \*   \*   \*   \*   \*   \*
>
> The selection of the starting material was, presumably, not obvious but such selection is not a category of patentable invention. 35 U.S.C. 100." [3].

The solicitor further replies to appellants' argument that it was unexpected to find that the new strain of microorganism would produce a useful compound with the assertion that "the record reveals that three strains of the genus *Streptomyces*, \* \* \* [on culture] produce daunorubicin. No evidence in this record establishes that fermentation of *any* strain of *Streptomyces* under the conditions in claims 1–5 will not give the same result."

## OPINION

We agree with appellants that *Kuehl* controls this case. We there reiterated that the statutory standard of § 103 for determining obviousness of an invention is whether in view of the prior art the invention as a whole would have been obvious at the time it was made. In *Kuehl* the appealed claims were directed to the use of a novel aluminosilicate zeolite, ZK–22, as a catalyst in hydrocarbon cracking processes. The prior art Frilette patent showed the use of other zeolites as *hydrocarbon cracking catalysts*. The board in *Kuehl* maintained that the claims directed to this use of ZK–22 represented "the obvious use of the claimed aluminosilicate" and that for the invention of the process claims "to be unobvious there would have to be a showing by appellant that the use of his admit-

2. DiMarco et al., Daunomycin, a New Anti-

tedly novel catalyst in the hydrocarbon cracking process of Frilette gave unexpected results." We disagreed with the approach taken by the Patent Office, which was to ask whether "One skilled in the art [given the novel catalyst] \* \* \* would expect it to have the same catalytic effect that the known zeolites have." We said "the process 'invention as a whole' includes the use of the ZK–22 zeolite and one having no knowledge thereof would not find it obvious to crack hydrocarbons using it as a catalyst." See also In re Schneider, 481 F.2d 1350, 1356 (Cust. & Pat.App. 1973), and In re Wadlinger, 496 F.2d 1200 (Cust. & Pat.App.1974).

Applying the art which is of record, we believe that the invention is not prima facie obvious. Without *Streptomyces bifurcus, strain DS 23,219*, knowledge of which is supplied by appellants' application and availability of which is supplied by appellants' deposit of the microorganism with the Department of Agriculture, one skilled in the art would not find it obvious to produce daunorubicin by aerobically cultivating *Streptomyces bifurcus*. Apropos is the following soliloquy from appellants' brief which is illustrative of the situation here:

> What is one of ordinary skill in the art taught from the references? He is taught that daunorubicin can be formed from the cultivation of *Streptomyces coeruleorubidus 8899, Streptomyces coeruleorubidus 31,723*, and *Streptomyces peucetius* and no more. Given these references, how is the artisan led to *Streptomyces bifurcus, DS 23,219*, and how is the artisan led to daunorubicin produced from this new strain of *Streptomyces?* He is led thereto only through the directions given on the road signs of appellants' very own disclosure.

The approach taken by the solicitor in putting the burden on appellants to show "that *any* microorganism of the genus *Streptomyces* will not yield daunorubicin when fermented under the condi-

---

3. This last statement appears overly broad. See In re Kuehl, supra.

tions recited in claims 1–5" is in conflict with the requirements of § 103, for even if all strains of *Streptomyces* would yield daunorubicin under the specified conditions, the process of producing the antibiotic *by culturing Streptomyces bifurcus* would still be unobvious to those of ordinary skill in the art for the simple reason that the microorganism is unknown to them. As for the board's suggestion that appellants merely made a "choice" of a different strain, one cannot choose from the unknown.

### In re Kanter and the Method-of-Making Cases

In re Kanter and In re Neugebauer, cited by the solicitor, involved situations where the novelty resided, not in the starting materials which were *used in* the claimed process, but in the product *produced* by the process. In *Kanter,* the base metal alloy used as a starting material in the claimed process, although not previously used in the process, was old.[4] In *Neugebauer,* which was relied upon in *Kanter,* we considered the obviousness of claims directed to a method of making an electrophotographic material by a single-step coating process, where claims had been allowed to the material produced. We think that there is a significant difference between a method of making a novel product and a method of using a novel product. Cases such as *Kanter,* which involve the former, are not controlling in the latter situation.

In *Kuehl,* the solicitor also maintained that method-of-making cases such as In re Larsen, 292 F.2d 531, 49 CCPA 711 (1961), were analogous and ought to control in the method-of-use situation, and we there stated our disagreement with the proposition of the solicitor "that the claims calling for a *process using* an unobvious composition ought to be treated identically with claims calling

for the process of making an unobvious composition." We do so again, reiterating that under § 103 neither a novel product made by, nor a novel starting material used in, the process can be treated as prior art. In the method-of-use cases, such as *Kuehl,* the novelty of the starting material may lend unobviousness to the process. In the cases where the invention is a process for making a new product, however novel the product may be, the claimed process steps and starting materials may themselves still be old and the process therefore obvious. This is clearly the situation in the *Kanter* case where the starting material, the base metal alpha-delta alloy, was not itself alleged to be new but only "not previously used in the process." We thus do not consider *Kanter* controlling here where the claimed invention is a *method of using* the *new Streptomyces* strain.

The Patent Office Board of Appeals seems to have recognized the distinction between the *Larsen* line of cases dealing broadly with the processes for making a product and cases dealing with a process using a composition in Ex parte Rue, 155 USPQ 474, 475 (Pat.Off.Bd.Appls. 1967), where the board stated in language applicable to the facts of this case:

We will not sustain this rejection [of two process claims]. The claims appear to us to be drawn to a properly defined process. *Process claims may not be rejected simply because they recite the use of new materials in an old process* which process is otherwise proper, 35 U.S.C. 100(b) [Emphasis ours.]

In re Larsen, 49 CCPA 711; 1961 C.D. 567, 772 O.G. 889, 292 F.2d 531, 130 USPQ 209, cited by the examiner is not in point with this case in view of the above and further because the

---

4. Apparently the language of the *Kanter* opinion leaves some doubt on this point, but the reference to the "new" substratum in the opinion is clearly meant to refer to the fact that the use of an alpha-delta alloy was *new to this art.* The specification of the

*Kanter* application states that "The stable alpha-delta iron alloys, which maintain a body centered cubic lattice structure throughout the solid phase, are well-known * * *."

process therein was for *making* not *using* the compound claimed.

*The Nature of This Invention: A Process of Producing a Known Antibiotic Using a New Strain of Microorganism*

We recognize the differences between this case and the situation in *Kuehl,* where the novel zeolite used as a catalyst in the claimed hydrocarbon cracking processes was itself the subject of allowed claims in the application. Here appellants not only have no allowed claim to the novel strain of *Streptomyces* used in their process but would, we presume (without deciding), be unable to obtain such a claim because the strain, while new in the sense that it is not shown by any art of record, is, as we understand it, a "product of nature." However, it is not required for unobviousness of the method-of-use claims that the new starting material be patentable, In re Schneider, supra; 35 U. S.C. § 103.

The process of using the new *Streptomyces* strain which appellants have discovered is clearly within 35 U.S.C. § 101, and we note the ready willingness of the board here, as in Ex parte Arzberger and Ex parte Kropp, to allow appellants to claim it if they show unexpected results from the use of this new strain. Indeed, the public interest appears to be well served by encouraging the patenting of such inventions. While the patent will grant appellants a limited right to exclude others from producing daunorubicin by the use of *Streptomyces bifurcus,* the public receives not only the knowledge of appellants' discovery but also access to *Streptomyces bifurcus* through its deposit with the Department of Agriculture. See In re Argoudelis, supra.

For the foregoing reasons, the decision of the board is reversed.

Reversed.