UNITED STATES *v.* C. J. TOWER & SONS (No. 4864) [1]

[1] C. A. D. 626.

1

United States Court of Customs and Patent Appeals, November 30, 1956

*George Cochran Doub,* Assistant Attorney General, *Richard E. FitzGibbon,* Chief, Customs Section (*William J. Vitale* and *Richard H. Welsh,* trial attorneys, of counsel), for the United States.
*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for appellee.

[Oral argument October 3, 1956, by Mr. Welsh and Mr. Schwartz]

Before JOHNSON, Chief Judge, and O'CONNELL, WORLEY, COLE, and RICH, Associate Judges

JOHNSON, Chief Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs Court, 1st Division, entered pursuant to its decision (C. D. 1733), sustaining a protest on behalf of the importer against the collector's classification and duty assessment of limestone slabs under paragraph 234 (c) of the Tariff Act of 1930, as modified by the Annecy Protocol of Terms of Accession to the General Agreement on Tariffs and Trade, T. D. 52476 (85 Treas. Dec. 138).

The merchandise at bar, which consists of limestone slabs suitable for use as monumental or building stone, and which was imported from Canada, was classified by the Collector of Customs as "hewn, dressed, or polished, or otherwise manufactured" and assessed a duty of 25% ad valorem.

Appellee claimed the limestone slabs to be properly classifiable as "unmanufactured, or not dressed, hewn, or polished" and dutiable at 7½¢ per cubic foot.

The essential portion of the involved paragraph of the Tariff Act of 1930, as modified, reads as follows:

234 (c) * * * limestone * * * suitable for use as monumental or building stone * * * hewn, dressed, or polished, or otherwise manufactured, 25 per centum ad valorem; unmanufactured, or not dressed, hewn, or polished, 7½¢ per cubic foot.

The facts, which are undisputed, are herewith set forth:

The limestone was quarried by a method known as "wedging," which resulted in large rectangular blocks of 10 to 15 tons in weight, about 100 cubic feet in content and measuring approximately 5 feet in length, 4 feet in width, and 5 feet in height. These large blocks were then sawn, by means of gang saws, into slabs. Appellee's illustrative Exhibit No. 3 illustrates that the sawn surfaces of these slabs are coarse and have numerous raised surfaces which invariably result from the sawing operation due to the nature of the limestone.

The record indicates that the large blocks are sawn into standard stock thicknesses of 2⅝, 3, 4, 5, 5¼, 5½, 6, 7 and 8 inches, and that effort is also made to keep stock slabs of 9, 10, 11 and 12 inches in thickness.

In filling an order, the producer selects a slab of a thickness from ¼ to ⁵⁄₁₆ of an inch greater than the thickness specified in said order. The length and width dimensions are obtained by drilling a series of holes in the slab and inserting wedges, which are then tapped until a break or split occurs at the desired points. The length and width dimensions obtained in this fashion are approximately 2 to 3 inches greater than those specified.

According to witnesses who testified on behalf of appellee, the purpose of the operations above detailed is twofold:

(1) A desire on the part of the producer to provide the purchaser with material sufficient to produce the desired finished stones with a minimum of waste and a minimum of expense for shipping costs.

(2) To facilitate transportation of the stone.

With regard to the former purpose, the pieces shipped in response to an order do not necessarily total the number of individual pieces ordered. If one slab can be furnished which will supply sufficient material for two units of finished material, the single slab is shipped.

With respect to the latter purpose, the record indicates that the purchaser of the slabs at bar, the Glenwood Stone Company of Rochester, New York, uses its own trucks to transport them from the plant of the producer to its own plant, that the trucks are not suitable for the transportation of the large quarried blocks, and that it has neither the crane nor sawing facilities sufficient to handle them in their quarried condition.

When the slabs reach the purchaser's plant, approximately one-half inch of stone is removed from one of the sawn surfaces to bring the stone to its desired finish. The remaining slab surfaces are then treated with machine or power tools so that, in the finished piece, none of the surfaces of the slabs as they existed in their imported condition remain.

There is no doubt but that the limestone slabs at bar are "suitable for use as monumental or building stone."

The issue in this case is simply, therefore, whether, as the Government contends, the limestone slabs are "hewn, dressed, or polished,

or otherwise manufactured," or, as is claimed by the importer, they are "unmanufactured, or not dressed, hewn, or polished."

No attempt was made at the trial to establish commercial designation of the statutory terms in question. It is well established that in the absence of commercial designation, the common meaning of the statutory terms will prevail. *Heyliger & Raubitschek* v. *United States*, 11 Ct. Cust. Appls. 90, T. D. 38735.

James Ridley Doolittle, assistant general manager of the Queenston Quarries, Ltd. of Niagara Falls, Ontario, and a witness on behalf of appellee, gave the following undisputed testimony as to the common meanings of the terms "hewn," "dressed" and "polished":

Q. Do you first know what hewn stone is?
A. That is a term not normally used by us and is not a familiar word; my understanding of the word "hew" is to work by hand with an ax. It is a form of operation that used to be done in the old hand method when they worked stone at the quarry site; our methods of working stone are mechanical.
Q. Do you know what the term "dressed" means with relation to stone?

*      *      *      *      *      *      *

A. To work stone, to request a specified finish and accurate dimensions.
Q. And do you know what the term polish means with relation to stone?
A. Yes; to get the surface of the stone to a smooth and glossy finish.

While opinions of witnesses as to the common meaning to be attached to a word will be considered, it is well established that recourse may be made to lexicographers and other reliable sources of information to determine the common meaning of statutory words. *United States* v. *Crosse and Blackwell, Inc.*, 22 C. C. P. A. (Customs) 214, T. D. 47141; *Savannah Sugar Refining Corp.* v. *United States*, 20 C. C. P. A. (Customs) 272, T. D. 46061.

The terms "hewn, dressed, and polished" are thus defined by various lexicographic sources as follows:

*Hawkins Mechanical Dictionary* (Copyright 1909; Impression 1935):
Hewn Stone.—Blocks of stone, the faces of which have been dressed into shape by the hammer and chisel.
Dressing Stone.—The act or process of cutting and shaping stone to its desired form.
*Knight's American Mechanical Dictionary* (Copyright 1872, 1876):
Hewn-stone. Stone blocks in which the faces are hammer-dressed to shape.
*Webster's New International Dictionary* (1932 Edition):
hewn, p. a.
2. Of stone, roughly dressed as with a hammer.
dress, v. t.
2. * * * to prepare for use or service; esp., to cleanse, trim, or apply the finishing touches to * * *
b. * * * to trim and smooth, as * * * stone. * * *
polished, p. a.
Smooth and glossy; hence, highly finished * * *

Both Doolittle's and the dictionary definition of the term "polished" are in accord. That the term, in relation to stone, refers to stone which

bears a smooth and glossy surface, is clear. We feel, as well, that the dictionaries warrant our acceptance of Doolittle's definition of the term "dressed" as referring to stone which has been worked to a specified surface finish and to accurate dimensions. These dimensions would appear to be those desirable in the ultimate article of commerce.

But while Doolittle places great stress on the "hand-tooled" aspect of the hewing operation, the lexicons indicate that the controlling characteristic of the operation is that it results in stone which is "dressed" or roughly so. Thus, "hewn" stone would include stone which has been dressed roughly to finished dimensions.

While we have devoted considerable effort to establish the meanings of the terms "hewn," "dressed" and "polished," in the view we take of this case it is not in fact necessary to determine whether or not the limestone at bar has been so treated as to bring it within the purview of these terms. These meanings, however, are necessary for a proper determination of whether or not the limestone has been "otherwise manufactured," as will hereinafter be seen.

With this in mind we will proceed to consider whether the limestone slabs were "otherwise manufactured."

Appellee contends that this phrase is limited in scope to conditions which are analogous to or *ejusdem generis* with those named, i. e., "hewn, dressed, or polished," and cites *August Bentkamp* v. *United States*, 40 C. C. P. A. (Customs) 70, C. A. D. 500, as its authority.

The rule of *ejusdem generis* (where particular words of description are followed by general terms, the latter refer only to things of a like class with those particularly described) is a well known rule of construction, often used by this court, to aid in arriving at the legislative intent of Congress, which, of course, is the ultimate consideration in the construction of tariff statutes. The rule is primarily designed to preserve the meaning of the particular words as well as to give to the general words an interpretation consistent with the manifest purpose of the entire act. *Overton & Co.* v. *United States*, 2 Ct. Cust. Appls. 422, T. D. 32172. The latter purpose subserves an even more fundamental purpose of giving effect, if possible, to *all* words in a statutory provision, since the legislature is not presumed to have used superfluous words. 2 SOUTHERLAND, STATUTES AND STATUTORY CONSTRUCTION § 4909, at 398 (3rd ed. 1943); *Carey & Skinner, Inc.* v. *United States*, 42 C. C. P. A. (Customs) 86, C. A. D. 576.

However compelling the foregoing considerations may appear, it is equally well established that the rule of *ejusdem generis* is inapplicable where general words are associated with specific designations of unlike genera. In such an instance, the general words are deemed to remain unaffected by their association with the specific designations. 2 SUTHERLAND, *supra*, § 4912.

In the case at bar, the words "or otherwise manufactured" follow the more specific words "hewn," "dressed" and "polished." As has been discussed, the word "hewn," as it is used in relation to stone, refers to stone which has been roughly reduced to the dimensions desired. "Dressed" refers to stone which has been reduced to a specified finish and accurate dimensions. And "polished" has reference to a high degree of surface finish on the stone. The three words refer to different *degrees* of treatment and have no characteristic common to all of them from which may be inferred an intention on the part of Congress to restrict the effect of the general provision to any particular class of conditions. Thus, the rule of *ejusdem generis* has no applicability here.

The *Bentkamp* case, *supra*, which involved a provision for " * * * shells, not sawed, cut, flaked, polished, or otherwise manufactured * * *" (Par. 1738 of the Tariff Act of 1930), cannot be relied upon for the authority which appellee asserts. Though this court therein was of the opinion that the phrase "or otherwise manufactured" must relate to operations *ejusdem generis* with those operations enumerated, its decision was based upon the manifest intent of Congress to avoid an interpretation placed upon a predecessor paragraph of the paragraph *there* involved by the Supreme Court in the case of *Hartranft* v. *Wiegmann*, 121 U. S. 609 (1887). Not only does the enumeration in the *Bentkamp* case differ from that in paragraph 234 (c), which difference, in and of itself, might be determinative of the applicability of the rule of *ejusdem generis* to the former provision and the non-applicability of said rule to the latter, but, as well, here there is no question of a manifest intention of Congress to avoid an interpretation given to the paragraph in question. In the absence of such evidence of intention, we must avail ourselves of the well-established rules of construction, stated hereinbefore, to determine congressional intent.

The foregoing considerations, therefore, compel us to conclude that the limestone at bar is dutiable at 25% ad valorem if it is "hewn, dressed, or polished" or *manufactured in any other way*. We need now only consider the legal significance of the word "manufactured" and apply the law to the facts of this case.

Appellee contends that the term "manufactured" refers only to articles which are "made into a new and different article having a distinctive name, character, or use," and cites the *Hartranft* case, *supra*, as authority for this contention.

That case involved competition between "*manufactures* of shells" and "shells of every description, not *manufactured*." Referring to the term "manufactures," the Supreme Court stated that only an article which had been manufactured into a new and different article, having a distinctive name, character or use from that of the original article

could be classified as a "manufacture." The court went on to apply this definition to "manufactured" articles, as well, but this extension is not deemed controlling in the case at bar.

For it is now thoroughly established that a provision for a named material "manufactured" and one for "manufactures" of that material have different tariff meanings. *United States* v. *Nippon Co. et al.*, 32 C. C. P. A. (Customs) 164, C. A. D. 303. While to constitute an article a manufacture, it may be necessary to convert the article into an entirely different article, it is only necessary that the article be so processed that it be removed from its crude or primary state, though it remain a variety of the original material, to be manufactured. (See *Nippon* case, *supra*, and other cases cited therein.)

This rule is tempered, however, by the rule that an article will not be excluded from classification as "unmanufactured" by reason of its having been subjected to a manufacturing process designed solely to prepare the article for shipment, even though such preparation incidentally advances the article for its intended use. *Lackawanna Steel Co. et al.* v. *United States*, 10 Ct. Cust. Appls. 93, T. D. 38359.

Appellee, citing the *Lackawanna* case, contends that, since the slabs at bar were sawn primarily to facilitate transportation, and despite the fact that they were incidentally advanced towards their intended use, they should not be deemed "otherwise manufactured."

We do not agree with this contention.

The *Lackawanna* case involved limestone crushed to diameters of $\frac{1}{16}''$–$4''$ to facilitate transportation, and requiring further manufacturing processes before the limestone was usable. The court stated in part:

> While the crushing at the quarry may necessarily have facilitated the crushing at the point of ultimate use, by rendering larger or more powerful crushing machinery unnecessary, upon the facts of this record it cannot be said that the former was done as a manufacturing process for any particular use, or for any such purpose whatsoever.
>
>     \*      \*      \*      \*      \*      \*      \*
>
> \* \* \* this record incontrovertably showing that this crushing was done solely to facilitate transportation, \* \* \* the court is not prepared to deny importers this right because perchance it may also benefit the ultimate consumer. \* \* \*

The court further stated:

> \* \* \* These importations however, are not \* \* \* ready for ultimate use. On the contrary, they must undergo several processes, *including* a preliminary one of crushing, before they are made ready for ultimate use. (Emphasis quoted.) The record clearly establishes that the crushing at the quarries for the purposes of transportation *does not supersede and render unnecessary crushing at the destination and for final use.* \* \* \* [Emphasis added.]

Thus, it is clear that, in the *Lackawanna* case the influencing and controlling factor was that the processes to which the imported stone were subjected included an *additional crushing* operation, whereas

the sawing operation in the case at bar obviated the need for any like operation by the importer.

Furthermore, it is not at all apparent that the slabs here involved were sawn *solely* to facilitate transportation. Though the record indicates that the large blocks of limestone *as quarried* could not be conveniently transported, it seems inconceivable that the situation was such that the importer could only conveniently handle slabs which were sawn to within $\frac{3}{16}$-$\frac{1}{4}''$ of the ordered and $\frac{1}{2}''$ of the desired thickness dimension. The tolerances involved are too fine to support such a finding. It is our view, therefore, that the limestone slabs at bar have been "otherwise manufactured."

For the foregoing reasons, the decision of the Customs Court is *reversed.*

WORLEY, J., concurs in the conclusion.

COLE, J., was present at the argument of this case, but because of illness, did not participate in the decision.