**Application of Ananda M. CHAKRABARTY.**

**Patent Appeal No. 77–535.**

United States Court of Customs and Patent Appeals.

March 2, 1978.

Leo I. MaLossi, Schenectady, N. Y., attorney of record, for appellant, Joseph B. Forman, Arlington, Va., Joseph T. Cohen, Schenectady, N. Y., of counsel.

Joseph F. Nakamura, Washington, D. C., for the Com'r of Patents, Gerald H. Bjorge, Washington, D. C., of counsel.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Judges.

RICH, Judge.

This appeal by an applicant for a patent, assignor to General Electric Company, is from a decision by the United States Patent and Trademark Office (PTO) Board of Appeals (board) affirming the rejection of claims 7–9, 13, 15, 17, 21, and 24–26 of application serial No. 260,563, filed June 7, 1972, entitled "Microorganisms Having Multiple, Compatible Degradative Energy-Generating Plasmids and Preparation Thereof." We reverse.

### The Invention

In view of the legal issue presented, it is unnecessary to describe in detail the subject matter of the appealed claims, which is described in complicated biological terminology and is of a highly technical nature involving the modification of bacteria to solve man's practical needs. In this instance, the immediate need is the important one of controlling oil spills, as one example, by the degradation of complex hydrocarbons such as crude oil and "Bunker C" oil through the action of microorganisms. Microorganisms, that is to say bacteria, are modified for this purpose by what is sometimes referred to as "genetic engineering," a term appearing in appellant's specification. It is also disclosed therein that prior to appellant's invention microbial strains were known that can decompose individual components of crude oil, any given strain degrading only a particular component of the oil. For this reason biological control of oil spills had involved the use of a mixture of strains on the theory that the cumulative degradative actions would consume the oil and convert it into a cell mass which, in turn, serves as food for aquatic life. However, in the use of such a mixture there was ultimate survival of but a portion of the initial collection of bacterial strains with the result that the bulk of the oil spill remained unattacked for a long period. Appellant's invention involves the creation of a new strain of bacteria by the incorporation in a *single* cell, by transmission thereinto of a plurality of compatible "plasmids," of a capacity for simultaneously degrading several different components of crude oil with the result that degradation occurs more rapidly. To make this non-technical description somewhat more intelligible we quote from the specification but two of its many definitions:

> *Extrachromosomal element* . . . a hereditary unit that is physically separate from the chromosome of the cell; the terms "extrachromosomal element" and "plasmid" are synonymous; when physically separated from the chromosome, some plasmids can be transmitted at high frequency to other cells, the transfer being without associated chromosomal transfer.
>
> *Degradative pathway* . . . a sequence of enzymatic reactions (e. g. 5 to 10 enzymes are produced by the microbe) converting the primary substrate [i. e., oil] to some simple common metabolite, a normal food substance for microorganisms.

This sketchy background, it is hoped, will give some idea of the nature of the invention at bar as defined in illustrative claim 7 which reads:

> 7. A bacterium from the genus *Pseudomonas* containing therein at least two stable energy-generating plasmids, each

of said plasmids providing a separate hydrocarbon degradative pathway.[1]

The specification disclosure contains examples of bacterial strains with four hydrocarbon degradative pathways and the statement: "If there is an upper limit to the number of energy-generating plasmids that will be received and maintained in a single cell, this limit is yet to be reached."

The PTO, speaking through the examiner as well as the board, has not questioned that appellant has invented and adequately disclosed strains of bacteria, within the definitions of his rejected claims, which are new, useful, and unobvious.

Neither has any question been raised by the PTO about the inventions of the rejected claims being in the useful or technological arts so that their protection for a limited time by patent would be an implementation of the Constitutional purpose of promoting progress in the "useful arts." Art. I, sec. 8, clause 8.

### The Rejection and the Board's Decision

The decision and opinion of the board are quite similar to its action and reasoning in the recent case of In re Bergy, 563 F.2d 1031, 195 USPQ 344 (Cust. & Pat.App.1977), wherein we reversed the decision of the board (subsequent to its decision herein).

In the present case, the board first pointed out that the examiner had rejected the appealed claims only under 35 U.S.C. § 101[2] "on the ground that they are not encompassed by the provisions" thereof, advancing two reasons therefor: (1) that the claimed microorganisms are "products of nature" and (2) that they are drawn to "live organisms." The board reversed the examiner on point (1), agreeing with appellant that the claimed bacteria are not naturally occurring. This decision was expressed in a single sentence and the rest of the board's opinion was devoted to a discussion of the legal effect of the fact that the claimed bacteria are alive.

The board first discussed a number of cases which it had considered and concluded that there is "no case dealing directly with the point here in issue," including, possibly as of first importance, the Supreme Court's opinion in Funk Brothers Seed Co. v. Kalo Inoculant Co., 333 U.S. 127, 68 S.Ct. 440, 92 L.Ed. 588 (1948). (In Bergy, supra, the board also stated that it had "not found any case directly in point.") The board then pursued exactly the same line of reasoning it did in Bergy, in large part in the same words, to reach the same conclusion it expressed in Bergy, that § 101 "does not include living organisms." The board's opinion that § 101 does not include any living organism was expressed in the form of its belief that Congress did not so intend. As in Bergy, this view was deduced from the enactment of the Plant Patent Act of 1930, citing this court's opinion in In re Arzberger, 27 CCPA 1315, 112 F.2d 834, 46 USPQ 32 (1940).[3]

Responsive to the initial opinion of the board, appellant filed an extensive petition for reconsideration pointing out that the examiner had first raised the "living organism" question in his Answer to appellant's brief on his appeal to the board, wherefore appellant had not had an opportunity to

---

1. As a matter of general interest, the assignee of appellant's invention has been granted British patent 1,436,573 containing this and other claims to the bacterium.

2. 35 U.S.C. § 101 reads:
   § 101. *Inventions patentable*
   Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.

3. Although *Bergy* reached this court and was decided before the instant appeal (*Chakrabar-*

ty), the latter was the first to be decided by the board. The two cases were clearly pending in the board at the same time and were decided by entirely different 3-man panels. *Chakrabarty* was decided May 20, 1976, and *Bergy* June 22, 1976. Bergy appealed forthwith but Chakrabarty filed a petition for reconsideration which was decided October 19, 1976. *Bergy* was argued in this court on March 3, 1977, and *Chakrabarty* on December 5, 1977. Any common language found in the board's two opinions—and there is much—presumably originated in the *Chakrabarty* case.

present argument directed to the significance of the passage of the Plant Patent Act as an indication of the intent of Congress with respect to all living things, and argued that there was good reason to pass a special act for plants, other than the fact they are alive. That reason was that plants cannot be so described in a patent specification as to enable the reader to produce them, as was required of other inventions by R.S. 4888, the predecessor of 35 USC 112, first paragraph, for which reason special legislation relaxing that requirement in the case of plants was necessary. Thus, appellant argued, the passage of the Plant Patent Act is not to be taken as "an expression of *any* sort of Congressional intent with respect to the patentability of living organisms." The board's opinion on the petition reiterated that it knew of "no case dealing with the point here in issue," stating, more specifically, that "microorganisms per se have not squarely been ruled either eligible or ineligible for product patent coverage in any reported court or Patent Office decision," and adhered to its original opinion and decision. Appeal to this court was thereupon filed.

## OPINION

Appellant's reply brief succinctly sums up the issue before us in these words:

In the instant appeal, appellants [sic] are seeking protection for a *new bacterium,* admittedly alive, in which such changes have been effected as to produce in this bacterium *new capabilities.* The Board of Appeals has agreed that this organism is *not a "product of nature".* If it be accepted that all things in our world are either products of nature or things produced by man, then by the process of elimination the Board of Appeals has agreed with appellant's contention that his new bacterium is a thing produced by man, i. e. a manufacture. It should follow, therefore, that * * * appellant has *already* met the requirements of Section 101.

The PTO has advanced but a single reason to support its contention that this is not so,

namely, that the new bacterium is *alive.* That is precisely the single issue we had to pass on in *Bergy.* The decision of the board herein was rendered and the main briefs of the parties hereto were filed before we handed down our *Bergy* decision. Thereafter we invited the parties to file briefs on the bearing of the *Bergy* decision on this case. Appellant opined that "the *Bergy* decision appears to be controlling precedent * * *." The PTO brief said *Bergy* "might be considered dispositive of the issue presented [herein] if that decision remains a viable precedent." It then pointed to the fact that in *Bergy* the claim was directed to a "biologically pure culture" and that we had made it clear in our *Bergy* opinion that we were not deciding anything other than the question whether that claimed invention was a manufacture or a composition of matter within § 101, adding that "the Commissioner is uncertain whether *Bergy* has any bearing at all" in view of the fact that no claim here involved is so limited.

We do not consider the differences between the claims here and the claim in *Bergy* to be of any significance on the issue before us. In both cases the claims are directed to microorganisms and in both the *only* asserted objection to their patentability is that the microorganisms are alive and, for that reason *alone,* not within the § 101 categories of inventions which may be patented. We dealt fully with that identical issue and with the identical PTO arguments in *Bergy.* Nothing in the facts of this case requires that we add anything to what we there said. *Bergy* is, in this court at least, a controlling precedent.

The decision of the board is *reversed.*

*REVERSED.*

MARKEY, Chief Judge, concurring.

I join in full the well reasoned and cogently stated majority opinion of my Brother Rich. These few remarks are prompted, with all due respect, by the dissenting views expressed by my Brothers Baldwin and Miller.

The sole issue before us is whether a man-made invention, admittedly novel, useful, and unobvious, is unpatentable because, and only because, it is "alive" (in the sense that microorganisms are "alive").

There are but two sources for manufactures and compositions of matter. They are God (or "nature" if one prefers) and man.

As presented to us, the invention is admittedly a "manufacture" by man. It therefore falls squarely within the language of the statute. The Patent and Trademark Office desires to read into the statute the word "dead" before "manufacture" and before "composition." *

The statute is not ambiguous. No Congressional intent to limit patents to dead inventions lurks in the lacuna of the statute, and there is no grave or compelling circumstance requiring us to find it there.

The Plant Patent Act of 1930 has nothing to do with the case before us and is of no aid in a search for what the intent of Congress *would have been* were it confronted with the present invention. Moreover, it is not necessary that we assume plants to have been within the scope of the patent statutes prior to 1930. The legislative history of the Plant Protection Act of 1930 or of the Plant Variety Protection Act, referred to in dissent, does not establish that Congress thought it was overcoming an objection to plants as unpatentable solely because they were "alive."

If Congressional intent must be sought, I would look to its primary source—the words of the statute itself. The Constitution grants Congress the power to recognize the exclusive rights of inventors in their discoveries for a limited time to encourage progress in the useful arts. Acting under that grant, Congress has provided that a patent shall issue on a "manufacture" or a "composition," where, as here, the invention meets the criteria established in the statute. It would thus in this case defeat the fundamental purpose of the Constitution, and of the patent laws enacted thereunder, if we were to interpret the statute as though it included the word "dead."

Similarly, analogy to oranges unfairly and unjustly resurrects the "product of nature" issue, which all parties had thought was settled. That question is not before us.

As with Fulton's steamboat "folly" and Bell's telephone "toy," new technologies have historically encountered resistance. But if our patent laws are to achieve their objective, extra-legal efforts to restrict wholly new technologies to the technological parameters of the past must be eschewed. Administrative difficulties, in finding and training Patent and Trademark Office examiners in new technologies, should not frustrate the constitutional and statutory intent of encouraging invention disclosures, whether those disclosures be in familiar arts or in areas on the forefront of science and technology.

BALDWIN, Judge, dissenting.

I find the majority's statement of the issue in this case to be ambiguous and I disagree with Chief Judge Markey's broad statement of the issue. As I see it, the issue is whether applicant's modification of a clearly unpatentable living organism is sufficient to render the resulting living organism statutory subject matter. The majority apparently bases its argument on the belief that the claimed organisms must fall into one of two categories—"products of nature" ("manufactures" of God or nature) or patentable subject matter ("manufactures" of man). The PTO admits that the modified organism does not fall into the product-of-nature category, because the organism is not naturally occurring.[1] Therefore, the majority believes the modified organism must fall into the statutory subject

---

* If the oil degradating activity of the present invention were stopped, i. e., if the inventor had "killed" his invention, (and if the invention had some utility in its dead form) the Patent and Trademark Office reasoning would require allowance of appellant's application.

1. Contrary to Chief Judge Markey's statement, I find no admission by anyone that the present invention is a statutory "manufacture." "Manufacture" and "man-made" are not synonymous for patent purposes. *American Fruit Growers, Inc. v. Brogdex Co.*, 283 U.S. 1, 51 S.Ct. 328, 75 L.Ed. 801, 8 USPQ 131 (1930).

matter category. But the dichotomy underlying this syllogism is not the law.

The law, as propounded by the Supreme Court, defines *three* alternatives. Between true "products of nature" and statutory subject matter or "manufactures" lies an intermediate category of things sufficiently modified so as not to be products of nature, but not sufficiently modified so as to be statutory "manufactures." Therein are found the borax-impregnated oranges of *American Fruit,* note 1 supra, and, in my view, the organisms now before us.

The present case focuses on the degree and nature of modification necessary to convert an admittedly unpatentable living thing into statutory subject matter. The Supreme Court, in *American Fruit,* considered whether impregnating fresh fruit skins with borax to prevent molding changed the natural products into statutory subject matter. The Court stated that, in order to become statutory subject matter, the new article must possess "a new or distinctive form, quality, or property." 283 U.S. at 11, 51 S.Ct. at 330, 8 USPQ at 133. There must be a "change in the name, appearance, or general character of the" natural product. 283 U.S. at 12, 51 S.Ct. at 330, 8 USPQ at 133. It is not enough that the new article is better adapted to the use for which the natural product was already suited. 283 U.S. at 12, 51 S.Ct. 328, 8 USPQ at 133. I read *American Fruit* as saying that a modified natural product does not become statutory subject matter until its essential nature has been substantially altered. The issue in the present case becomes whether the modification effected by appellant altered the essential nature of the starting material.

Applying the *American Fruit* rule to the modification of living organisms and to the case before us, I believe that the essential nature of the unpatentable organism with which applicant started was its animateness or life. Appellant has not changed this essential nature; he has not created a new life. Rather, he has merely genetically grafted an extra plasmid on to the organism and, thereby, made the organism better at cleaning up oil spills. While this improvement in oil digesting ability does exclude the new organism from classification as a mere product of nature, like the borax-impregnated orange which was a better commercial product because it had a longer shelf life, this improvement in the utility for which the unpatentable starting material was already suited does not change the essential nature of the starting material and does not make the modified thing statutory subject matter.[2]

MILLER, Judge, dissenting.

I do not agree that appellant's claimed microorganisms are within the scope of 35 U.S.C. § 101, and I join in the statement of the board—

> We do not believe that Congress intended 35 U.S.C. 101 to encompass living organisms whether they be plants, modified microorganisms (such as bacteria), or modified multicellular organisms (such as mammals).

In *In re LeGrice,* 49 C.C.P.A. 1124, 1139, 301 F.2d 929, 939, 133 USPQ 365, 374 (1962), this court recognized that, under the Act of May 23, 1930, Pub.L. No. 245, 46 Stat. 376—

> The patent law, as shown by the Committee Reports, was *extended* to plant patents in order to stimulate interest in the breeding and commercial development of new and valuable plant species. [Emphasis added.]

Both the Senate and House committee reports to which the court referred (S.Rep. No. 315, 71st Cong., 2d Sess. 1 (1930); H.R. Rep. No. 1129, 71st Cong., 2d Sess. 1 (1930)) stated:

> The purpose of the bill is to afford agriculture, so far as practicable, the same opportunity to participate in the benefits of the patent system as has been given industry, and thus assist in placing agriculture on a basis of economic equality with industry. The bill will remove the existing discrimination between plant developers and industrial inventors.

The House Report, *id.* at 2, added:

> No one has advanced a just and logical reason why reward for service to the

---

**2.** I agree with Judge Miller's thorough analysis of the legislative history.

public should be extended to the inventor of a mechanical toy and denied to the genius whose patience, foresight, and effort have given a valuable new variety of fruit or other plant to mankind.

Thus, the legislative history clearly shows Congressional understanding that, under the patent law in effect prior to the Plant Patent Act of 1930, reward for service to the public in developing new varieties of plants had not been extended to inventors. See *Bobsee Corp. v. United States,* 411 F.2d 231, 237 n.18 (CA 5 1969).[1]

As pointed out in my dissenting opinion in *In re Bergy,* 563 F.2d 1031, 195 USPQ 344 (Cust. & Pat.App.1977), if, prior to the 1930 Act, living organisms had been within the scope of the terms "manufacture" and "composition of matter" (as the majority and concurring opinions must assume), the 1930 Act would have been superfluous. There is a basic presumption in statutory construction that Congress does not legislate unnecessarily. See *Platt v. Union Pacific Railroad,* 99 U.S. 48, 58, 25 L.Ed. 424 (1878); *In re Finch,* 535 F.2d 70, 71, 190 USPQ 64, 65 (Cust. & Pat.App.1976); *Skovgaard v. The M/V Tungus,* 252 F.2d 14, 17 (CA 3 1957), *aff'd* 358 U.S. 588, 79 S.Ct. 503, 3 L.Ed.2d 524 (1959); *United States v. Korpan,* 237 F.2d 676, 680 (CA 7 1956), *rev'd on other grounds,* 354 U.S. 271, 77 S.Ct. 1099, 1 L.Ed.2d 1337 (1957); *United States v. C.J. Tower & Sons,* 44 C.C.P.A. 1, 5, C.A.D. 626 (1956). Neither the majority nor the concurring opinion is able to point to anything to rebut that presumption. If, after nearly two hundred years, it is desired to interpret the basic patent statute, for the first time, to cover living matter, the presumption poses a formidable and yet unrebutted challenge. Although advancement of technology would naturally be of interest to an appropriate committee of Congress, it has no relevance to the court's responsibility for determining Congressional intent.

As noted by Chief Judge Markey in his concurring opinion in *In re McKellin,* 529 F.2d 1324, 1333, 188 USPQ 428, 437 (Cust. & Pat.App.1976):

[T]he patent law is statutory. Our representative form of government requires that the enactments of its Congress must always be, at the very least, the starting point. There being no common law of patents, we should take care to fill the Holmesian interstices of the statute with judge-made law only under the gravest and most impelling circumstances.

As also pointed out in my dissenting opinion in *Bergy,* if, prior to the 1930 Act, plants had been within the scope of the patent statutes (as the majority and concurring opinions must assume), a plant patent would have had to comply fully with what is now 35 U.S.C. § 112; but, under the 1930 Act, a plant patent for asexually reproduced plants need not do so (since such a patent could not be declared invalid if its description "is made as complete as is reasonably possible"—see section 2 of the 1930 Act). This would have constituted a repeal of the full-compliance requirement in the case of such patents without any Congressional discussion thereof. Repeal by implication is not favored statutory construction. *F.T.C. v. A.P.W. Paper Co.,* 328 U.S. 193, 202, 66 S.Ct. 932, 90 L.Ed. 1165, 69 USPQ 215, 219 (1946). The conclusion follows that, prior to the 1930 Act, plants were not within the scope of the patent statutes.

As further pointed out in my dissenting opinion in *Bergy,* coverage of plants under the Patent Act of 1952 was considered by Congress to be limited to plants falling under Chapter 15 of 35 U.S.C., and 35 U.S.C. § 101 was not considered to extend to any plants whatsoever, thus making it necessary to enact the Plant Variety Protection Act (1970), 7 U.S.C. § 2321 *et seq.*

Finally, the board made the following point:

We realize that 35 U.S.C. 101 does not expressly exclude patents on living or-

---

1. Each of the above-cited committee reports, at page 3, quotes Thomas A. Edison that—

Nothing that Congress could do to help farming would be of greater value and per-

manence than to give to the plant breeder the same status as the mechanical and chemical inventors now have through the patent law.

ganisms, but neither does it expressly exclude patents on mental processes, printed matter or methods of doing business. This point was fully developed in my dissenting opinion in *Bergy,* where it was observed that claims directed to a process of using an algorithm to operate a system have been held to constitute patentable subject matter, while claims directed to the algorithm *per se* (or to methods of calculating, using the algorithm) do not.

Other points made by the majority in its opinion in *Bergy,* to which it refers here, are fully answered by my dissenting opinion in that case.[2]

The decision of the board should be affirmed.

---

**2.** I am also persuaded by the point so well made in Judge Baldwin's dissenting opinion.